**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 19-22642-CIV-ALTONAGA/Goodman**

**VENUS CONCEPT USA, INC.,**

      Plaintiff,

v.

**SETIBA GROUP, INC.**; *et al.,*

      Defendants.

_____/

**SETIBA GROUP, INC.**; *et al.,*

      Counter-Plaintiffs,

v.

**VENUS CONCEPT USA, INC.,**

      Counter-Defendant.

_____/

**ORDER**

    **THIS CAUSE** came before the Court on Plaintiff/Counter-Defendant, Venus Concept USA, Inc.'s ("Venus['s]") Motion for Summary Judgment [ECF No. 55], filed on April 13, 2020. Defendants/Counter-Plaintiffs, Setiba Group, Inc. ("Setiba") and Emilia Khajavi ("Khajavi"; collectively, "Counter-Plaintiffs"), filed a Response [ECF No. 59]; to which Venus filed a Reply [ECF No. 63]. The Court has carefully considered the Complaint [ECF No. 1], Counter-Plaintiffs' Counterclaim[s] [ECF No. 13], the parties' written submissions,[1] the record, and applicable law.

---

[1] The parties' factual submissions include Venus's Statement of Material Facts in Support of its Motion for Summary Judgment ("Venus's SOF") [ECF No. 56]; Defendants/Counter-Plaintiffs' Amended Statement of Material Facts in Opposition to Plaintiff/Counter-Defendant's Motion for Summary Judgment ("Counter-Pls.' SOF") [ECF No. 75]; and Venus's Reply Statement of Material Facts in Support of its Motion for Summary Judgment ("Venus's Reply SOF") [ECF No. 76].

CASE NO. 19-22642-CIV-ALTONAGA/Goodman

## I.    BACKGROUND

This action involves competing claims concerning the purchase of medical aesthetic products and devices by Counter-Plaintiffs from Venus.  (*See generally* Compl.; Countercl.).  Venus is a Delaware corporation with its principal place of business in Weston, Florida.  (*See* Compl. ¶ 2).  Setiba is a California corporation operating a beauty, wellness, and medical spa.  (*See* Countercl. ¶¶ 2, 7).  Khajavi is Setiba's Chief Executive Officer and a resident of Woodland Hills, California.  (*See id.* ¶ 3; Khajavi Decl. [ECF No. 60] ¶ 1).

***The Agreements.***  On September 6, 2018, Venus and Setiba entered into a Venus Velocity Subscription Agreement (the "Velocity Agreement").  (*See* Venus's SOF, Ex. A, Velocity Agreement [ECF No. 56-1] 2).[2]  Under the Velocity Agreement, Setiba purchased a Venus Velocity laser-hair-removal system (the "Velocity System") for $64,999.99, plus tax and shipping.  (*See* Venus's SOF ¶ 2).  The Velocity Agreement requires Setiba to pay a one-time "License Fee" of $6,500.00, followed by 36 monthly installment payments of $1,651.09, plus tax.  (*Id.* ¶ 3 (internal quotations marks omitted)).

On December 31, 2018, Venus and Setiba entered into a Venus Viva Subscription Agreement (the "Viva Agreement").  (*See id.*, Ex. B, Viva Agreement [ECF No. 56-2] 2).  Under the Viva Agreement, Setiba purchased a Venus Viva skin-resurfacing system (the "Viva System"; together with the Velocity System, the "Systems") for $39,999.96, plus tax and shipping.  (*See* Venus's SOF ¶ 5).  The Viva Agreement requires Setiba to pay a one-time "License Fee" of $4,000.00, followed by 36 monthly installment payments of $1,007.51, plus tax.  (*Id.* ¶ 6 (internal quotations marks omitted)).  Khajavi supplied personal guarantees to Venus agreeing to "make all

---

[2] The Court uses the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings.

payments and meet all obligations required under" the Velocity Agreement and the Viva Agreement (collectively, the "Agreements"). (*Id.* ¶ 27; *see also id.* ¶ 26).

The Velocity Agreement is largely identical to the Viva Agreement. (*See id.* ¶ 7). Relevant here, the Agreements set forth similar title, training, warranty, and default terms. (*See generally* Velocity Agreement; Viva Agreement). The Agreements state title to the Systems and all risk of loss pass to Setiba upon Venus's delivery of the Systems to a shipping carrier. (*See* Venus's SOF ¶ 8). Immediately thereafter, the Agreements include a "Training" provision:

> Venus [] shall provide [Setiba] with the opportunity, free of charge and within 4 weeks of Delivery of the System[s], a one-time basic System-operation training session for up to six (6) participants of [Setiba's] personnel, as may be necessary for them to operate and use the System[s] in accordance with Venus['s] [] user manuals ("Basic Operation Training"). In the event that [Setiba] requests an immediate Basic Operation Training (i.e. to occur within 2 weeks of Delivery of the System[s]), or requests supplementary training in addition to the Basic Operation Training, such trainings will be charged in accordance with [Venus's] current rate schedule.

(Velocity Agreement ¶ 7 (alterations added; bold omitted); *see also* Viva Agreement ¶ 7).

The Agreements contain a "Limited Warranty" whereby Venus "covers defects in material and workmanship in the [] System[s.]" (Velocity Agreement ¶ 9(a.) (alterations added; bold omitted); *see also* Viva Agreement ¶ 9(a.)). The Limited Warranty states Venus will, at its "sole option, repair or replace any defects in material or workmanship in the System[s] without any costs to Setiba for parts or labor." (Venus's SOF ¶ 12 (alteration added; emphasis and internal quotation marks omitted)). The Agreements indicate Venus "will use its best efforts to deliver a service loaner System" to Setiba in the event Venus determines the Systems require warranty service. (*Id.* ¶ 13 (internal quotation marks omitted)).

The Limited Warranty excludes from coverage "any defects and damages" caused by Setiba's misuse of the Systems (*id.* ¶ 14 (internal quotation marks omitted)) and permits Venus to cancel or limit its coverage if Setiba fails to use Venus's Glide Glycerin product with the Systems

(*see id.* ¶ 15).   The Limited Warranty also contains language intended to limit Venus's liability and implied warranties:

> The warranties provided in this Section [] constitute Venus['s] [] sole and exclusive liability for defective or nonconforming Systems and shall constitute [Setiba's] sole and exclusive remedy for defective or nonconforming Systems.  These warranties are in lieu of all other warranties express or implied or statutory, including, but not limited to, implied warranties of merchantability or fitness for a particular purpose, and are in lieu of all obligations or liabilities on the part of Venus [] for damages. EXCEPT AS EXPRESSLY SET FORTH HEREIN, VENUS [] SHALL NOT BE LIABLE AND IS FURNISHING NO OTHER WARRANTIES AND THE CUSTOMER ASSUMES ALL RISK IN CONNECTION WITH THE USE OF THE EQUIPMENT AND SYSTEMS OTHER THAN AS EXPRESSLY STATED HEREIN.

(Velocity Agreement ¶ 9(f.) (alterations added; capitalization in original); *see also* Viva Agreement ¶ 9(f.)).

The Agreements obligate Setiba to make all payments within 10 days of the due date and indicate failure to do so constitutes a default under the Agreements.  (*See* Venus's SOF ¶¶ 19–20). Setiba's unilateral termination of the Agreements also constitutes a default under the Agreements. (*See id.* ¶ 21).  In the event Setiba defaults, Venus may exercise its options of (1) terminating the Agreements; (2) filing a lawsuit; or (3) limiting any services provided to Setiba under the Agreements.  (*See id.* ¶ 22).  If Venus elects to terminate the Agreements upon Setiba's default, it is entitled to liquidated damages, unpaid payments, interest on all unpaid payments, and fees and costs relating to Venus's enforcement.  (*See id.* ¶¶ 21–24).

***Venus's Performance under the Agreements***.   Venus delivered the Velocity System to Setiba in October 2018.  (*See id.* ¶ 28).  Immediately thereafter, Venus conducted an initial training session as required by the Velocity Agreement.  (*See id.* ¶¶ 28–29).  Following the training, Setiba performed approximately 15 to 20 treatments per day with the Velocity System.  (*See id.* ¶ 30).

Despite performing daily treatments, Setiba complained of various purported issues with the Velocity System, which Venus resolved by talking to Setiba's employees, sending replacement

parts, or making certain repairs. (*See id.* ¶¶ 31–32). In May 2019, Setiba reported a new issue with the Velocity System's hand piece. (*See id.* ¶ 33). Venus offered to replace the hand piece, but Setiba rejected the offer and demanded a new system. (*See id.* ¶ 34). To resolve the dispute, Venus offered a loaner system and to test the Velocity System at Venus's facility. (*See id.* ¶ 35). Setiba accepted Venus's offer. (*See id.* ¶ 36). Venus conducted 32 tests on the Velocity System; the Velocity System passed all the tests. (*See id.* ¶¶ 37–38).

As to the Viva System, in December 2019, Setiba expressed interest in purchasing a Viva System. (*See id.* ¶ 39). Venus conducted an initial training session for the Viva System with Setiba's staff. (*See id.*). Setiba's staff "appeared to grasp the training and demonstrated good technique." (*Id.* ¶ 42). Setiba executed the Viva Agreement shortly after the initial training session. (*See id.* ¶ 45). Venus offered follow-up training, but Setiba failed to schedule additional training sessions. (*See id.* ¶¶ 43–44). Setiba neither reported any problems with the Viva System nor requested any maintenance. (*See id.* ¶ 47).

Notwithstanding Venus's performance under the Agreements, Setiba stopped making the required monthly payments to Venus for the Systems. (*See id.* ¶¶ 49, 52). Setiba also returned the Viva System to Venus in "seriously damaged" condition. (*Id.* ¶ 55). Setiba's failure to make the required payments constituted a default under the Agreements. (*See id.* ¶¶ 50, 56). Nevertheless, Venus afforded Setiba an opportunity to cure the default, but Setiba failed to do so. (*See id.* ¶¶ 58–59). On June 25, 2019, Venus sent Setiba and Khajavi a written notice terminating the Agreements. (*See id.* ¶ 60).

***Setiba's Performance under the Agreements***. According to Setiba, in October 2018, Venus's junior territory manager, Christine Son, attempted to install the new Velocity System at Setiba's clinic but quickly realized "something was wrong" with the Velocity System. (Setiba's

Objs. & Resps. Venus's Interrogs.  ("Setiba's Resps. Interrogs.") [ECF No. 56-10] 6, 12 (internal quotation marks omitted)).  Venus immediately provided Setiba with a replacement system.  (*See id.* 12).  The replacement system began to malfunction after approximately three to four months of use.  (*See id.*; *see also id.* (providing specific examples of how the replacement system malfunctioned); Counter-Pls.' SOF ¶ 81).  As a result, in March 2019, Setiba requested a new system; Venus did not respond to Setiba's request.  (*See* Counter-Pls.' SOF ¶ 81; Khajavi Decl. ¶ 11).

In May 2019, Setiba informed Venus the replacement system "was not functioning properly" and again requested a new system.  (Counter-Pls.' SOF ¶ 82; *see also* Khajavi Decl. ¶ 12).  According to Khajavi, "[a]t one point, there were three [] Venus Velocity machines at Setiba, the original and two loaners, none of which were functioning, and none of which were being serviced by Venus pursuant to the [Agreements'] warranty." (Khajavi Decl. ¶ 14 (alterations added)).  Between May and August of 2019, Setiba did not have a functioning Velocity System despite multiple calls and emails to Venus's technical support to repair or service the three machines.  (*See* Counter-Pls.' SOF ¶ 85; Khajavi Dep. [ECF No. 60-6] 167:17–169:9).[3]  Lacking a functioning Velocity System, Setiba purchased a laser hair removal machine from another manufacturer.  (Counter-Pls.' SOF ¶ 85).

Regarding the Viva System, in December 2019, Venus delivered a 2017 demo machine for Setiba to use during a trial period.  (*See id.* ¶ 93).  Venus informed Setiba it would replace the 2017 demo machine with a new 2018 model — the Viva System — following the "trial period and upon satisfaction of Setiba."  (*Id.*; *see also id.* ¶ 94).  Venus, however, never delivered the 2018 Viva System, which, according to Setiba, "is the subject of the [Viva] Agreement."  (*Id.* ¶ 93 (alteration

---

[3] Citations to deposition testimony rely on the pagination and line numbering in the original document.

added)).   As a result, in January 2019, Setiba "informed Venus [] it wished to cancel the Viva Agreement" and "requested a return of its down payment under the Viva Agreement."  (*Id.* ¶ 94 (alteration added)).   Setiba returned the 2017 demo machine to Venus with the shipping label provided by Venus.  (*See id.* ¶ 97).

For both the Velocity System and Viva System, Venus provided incomplete one-time basic training and never provided Setiba with the proper training for the Systems.  (*See id.* ¶¶ 101–03).   Setiba attempted to schedule numerous training sessions for the Systems, but Venus ignored Setiba's requests.  (*See id.* ¶¶ 99–100, 103).

Setiba withheld monthly installment payments for the Systems "[a]s a result of Venus's failure to comply with the contract provisions regarding completing the basic training, providing supplementary training, or providing the required warranty repairs on the machines[.]"  (*Id.* ¶ 104 (alterations added)).   Venus's breaches caused Setiba damages "in that it paid monthly payments under the Agreements for machines that did not work for their intended purpose . . . and for lost business, profits, and revenue for patients [Setiba] lost due to . . . [Venus's failure] to comply with the Agreements, as well as the cost of replacement equipment."  (*Id.* ¶ 105 (alterations added)).   Venus terminated the Agreements without authorization and sued Setiba for damages.  (*See id.* ¶ 104).

***The Complaint***.   Venus asserts the following four claims: (1) breach of the Velocity Agreement against Setiba; (2) breach of the Viva Agreement against Setiba; (3) breach of the Velocity Agreement's guaranty against Khajavi; and (4) breach of the Viva Agreement's guaranty against Khajavi.  (*See generally* Compl.).

***The Counterclaim***.   Counter-Plaintiffs bring 13 counterclaims against Venus: (1) breach of contract — the Velocity Agreement; (2) breach of contract — the Viva Agreement; (3) unjust

enrichment; (4) breach of express warranty — the Velocity Agreement; (5) breach of express warranty — the Viva Agreement; (6) breach of implied warranty of merchantability — the Velocity Agreement; (7) breach of implied warranty of merchantability — the Viva Agreement; (8) breach of implied warranty of fitness for a particular purpose — the Velocity Agreement; (9) breach of implied warranty of fitness for a particular purpose — the Viva Agreement; (10) fraudulent misrepresentation; (11) fraudulent inducement; (12) negligent misrepresentation; and (13) violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Florida Statutes section 501.201, *et seq.*  (*See generally* Countercl.).

Venus seeks summary judgment on its claims asserted against Counter-Plaintiffs and Counter-Plaintiffs' counterclaims.[4]  (*See generally* Mot.).

## II.    LEGAL STANDARD

Summary judgment may only be rendered if the pleadings, discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a), (c).  An issue of fact is "material" if it might affect the outcome of the case under the governing law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  It is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party.  *See id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The Court draws all reasonable inferences in favor of the party opposing summary judgment.  *See Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000).

---

[4] Counter-Plaintiffs concede summary judgment is appropriate on the counterclaims stated in Count III (unjust enrichment); Count X (fraudulent misrepresentation); Count XI (fraudulent inducement); and Count XII (negligent misrepresentation).  (*See* Resp. 5, 8).  Counter-Plaintiffs also agree their "potential damages award may be limited by the language in the [A]greements."  (*Id.* 9 (alteration added)).  Given Counter-Plaintiffs' concessions, the Court does not address Venus's substantive arguments on these claims.

If the non-moving party bears the burden of proof at trial, the moving party may obtain summary judgment simply by: (1) establishing the nonexistence of a genuine issue of material fact as to any essential element of a non-moving party's claim, and (2) showing the Court that there is not sufficient evidence to support the non-moving party's case. *See Blackhawk Yachting, LLC v. Tognum Am., Inc.*, No. 12-14209-Civ, 2015 WL 11176299, at *2 (S.D. Fla. June 30, 2015) (citations omitted). "Once the moving party discharges its initial burden, a non-moving party who bears the burden of proof must cite to . . . materials in the record or show that the materials cited do not establish the absence or presence of a genuine dispute." *Id.* (citing Fed. R. Civ. P. 56(c)(1); alteration added; internal quotation marks omitted).

"Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the inferences that should be drawn from these facts." *Whelan v. Royal Caribbean Cruises Ltd.*, No. 1:12-cv-22481, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013) (citation omitted). Indeed, "[i]f reasonable minds might differ on the inferences arising from undisputed facts, then the Court should deny summary judgment" and proceed to trial. *Id.* (alteration added; citations omitted).

### III.   ANALYSIS

#### A.  Breach of Contract (Complaint Counts I & II; Counterclaim Counts I & II)

As noted, the parties assert competing breach-of-contract claims. (*See* Compl. ¶¶ 27–40; Countercl. ¶¶ 31–38). "For a breach of contract claim, Florida law[5] requires the plaintiff to plead and establish: (1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009)

---

[5] The parties do not raise a conflict-of-laws issue and do not dispute Florida law governs interpretation of the Agreements. (*See generally* Mot.; Resp.). Both Agreements upon which the Complaint and Counterclaim are predicated contain choice-of-law provisions that select Florida law. (*See* Velocity Agreement ¶ 23; Viva Agreement ¶ 23).

(alteration added; citing *Friedman v. N.Y. Life Ins. Co.*, 985 So. 2d 56, 58 (Fla. 4th DCA 2008)). "Under general contract principles, the plain meaning of a contract's language governs its interpretation." *Slater v. Energy Servs. Grp. Int'l, Inc.*, 634 F.3d 1326, 1330 (11th Cir. 2011) (citation omitted). The Court may not "isolate a single term or group of words and read that part in isolation; the goal is to arrive at a reasonable interpretation of the text of the entire agreement to accomplish its stated meaning and purpose." *Horizons A Far, LLC v. Plaza N 15, LLC*, 114 So. 3d 992, 994 (Fla. 5th DCA 2012) (internal quotation marks and citations omitted).

"To constitute a material breach of the contract, a party's noncompliance must go to the essence of the contract; it must be the type of breach that would discharge the injured party from further contractual duty." *Liquid Capital Exch., Inc. v. Rauseo*, No. 13-cv-20864, 2013 WL 12106069, at *4 (S.D. Fla. Oct. 11, 2013) (internal quotation marks and citations omitted). "A trivial noncompliance or minor failure to perform is not a material breach." *JF & LN, LLC v. Royal Oldsmobile-GMC Trucks Co.*, -- So. 3d --, 2020 WL 961580, at *7 (Fla. 2d DCA Feb. 28, 2020) (citation omitted). "Generally, whether there has been a breach of the terms of a contract is a question of fact for the factfinder." *Organo Gold Int'l, Inc. v. Aussie Rules Marine Servs., Ltd.*, 416 F. Supp. 3d 1369, 1377 (S.D. Fla. 2019) (internal quotation marks and citations omitted). Likewise, "whether there is a legitimate defense that excuses the breach is [] a question of fact." *Bryka Skystocks, LLC v. Skystocks, Inc.*, No. 11-cv-62135, 2013 WL 12090022, at *2 (S.D. Fla. June 11, 2013) (alteration added; citation omitted).

Venus states it is undisputed each of the elements of its breach-of-contract claims is satisfied. (*See* Mot. 13). Venus insists because Setiba failed to meet its payment obligations and significantly damaged the Viva System, Venus is entitled to recover the payments due and outstanding under the Agreements, including its enforcement costs and interest. (*See id.*). In

Venus's view, Setiba cannot "avoid responsibility for its breaches by asserting a litany of affirmative defenses . . . [and] meritless contentions." (*Id.* 14 (alterations added)).

Setiba does not dispute it entered into Agreements to purchase the Systems or that the Agreements required monthly installment payments. (*See* Resp. 2). Nor does Setiba dispute it failed to make payments as required by the Agreements. (*See id.*). Instead, Setiba contends its nonpayment was excused by Venus's "failure to provide the training called for under these [A]greements as well as [Venus's] failure to repair or replace faulty equipment." (*Id.* (alterations added)). Setiba states "[t]hese issues turn on factual questions and thus, summary judgment on [the breach-of-contract] counts is not warranted." (*Id.* (alterations added)). The Court agrees.

The parties' competing breach-of-contract claims reveal two disputed *factual* questions: (1) whether Setiba's and Venus's actions equate to material breaches; and (2) whether breach by one party excused performance by the other. By way of example, a dispute exists regarding whether Venus's purported failure to provide training was a material breach of the Agreements that excused Setiba's performance. In the Agreements, Venus is obligated to "provide [Setiba] with the opportunity . . . [for] a one-time basic System-operation training session for up to six (6) participants of [Setiba's] personnel, as may be necessary for them to operate and use the System[s] in accordance with Venus['s] [] user manuals[.]" (Velocity Agreement ¶ 7 (alterations added); *see also* Viva Agreement ¶ 7).

Setiba contends Venus neither provided Setiba with adequate training on the Velocity System, nor trained or guided Setiba on how to handle or recognize technical problems with the Velocity System. (*See* Setiba's Resps. Interrogs. 13; *see also* Khajavi Dep. 99:15 (stating Setiba did not receive "complete training"); Khajavi Decl. ¶¶ 31, 33 (same)). According to Setiba, Venus

"agreed to postpone Setiba's payments in the Velocity Agreement until such training occurred." (Setiba's Resps. Interrogs. 13).

Regarding the Viva Agreement, Setiba contends it "did not receive the proper training on the Viva [System] and that was the reason [why the Viva System] was not functioning properly and providing the desired results." (*Id.* 14 (alterations added); *see also* Khajavi Dep. 101:2 (testifying Setiba "did not get [] complete training[]" on the Viva System (alterations added)); Khajavi Decl. ¶¶ 32, 33 (same)). Again, Venus "agreed to postpone Setiba's payments in the Viva Agreement until [complete] training occurred." (Setiba's Resps. Interrogs. 14 (alteration added)). In Setiba's view, Venus's incomplete training did not permit Setiba to operate and use the Systems in accordance with Venus's user manuals and thus excused Setiba's nonpayment.

Venus disagrees. Venus maintains it provided the basic operational training referenced in both Agreements and did so despite multiple interruptions and delays caused by Setiba's staff. (*See* Venus's SOF ¶¶ 28–29, 39–40). According to Venus, "Setiba's staff appeared to grasp the training and demonstrated good technique." (*Id.* ¶ 42). Venus even offered additional training on the Systems, but Setiba failed to schedule follow-up training. (*See id.* ¶¶ 43–44; Venus's Reply SOF ¶ 99). Venus concludes "the undisputed evidence establishes Venus provided the basic training referenced in the [Agreements]" (Mot. 5 (alteration added)); and thus, Setiba cannot avoid its payment obligations (*see id.* 11–12).

As should be readily apparent from the parties' submissions and competing claims, issues of material fact preclude the entry of summary judgment. The jury — not the Court — needs to solve the fact questions as to whether Venus (or Setiba) breached the Agreements and whether any circumstances excused Setiba's (or Venus's) performance.[6] Indeed, as noted, whether there has

---

[6] Counter-Plaintiffs contend — and Venus disputes — Venus breached the Agreements by failing to (1) deliver the Systems in working order; (2) provide Setiba with a new Viva System; (3) send Setiba the Viva

been a breach of the terms of the Agreements is a question of fact, and whether a legitimate defense excuses the breach is also a question of fact. *See Organo Gold Int'l, Inc.*, 416 F. Supp. 3d at 1377, 1380–81. Venus's request for summary judgment[7] on the breach-of-contract claims as well as on Counter-Plaintiffs' counterclaims for breach of the same Agreements, must be denied. The parties' breach-of-contract claims will proceed.[8]

## B. Breach of Express Warranty (Counterclaim Counts IV & V)

Counter-Plaintiffs assert breach-of-express-warranty claims against Venus. (*See* Countercl. ¶¶ 43–52). "A manufacturer's liability for breach of an express warranty derives from, and is measured by, the terms of that warranty." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 525 (1992). "Under Florida law, a written warranty is treated as a contract and may therefore limit available remedies." *Bello v. Caterpillar Inc.*, No. 17-22326-Civ, 2018 WL 2214709, at *5 (S.D. Fla. Apr. 10, 2018) (internal quotation marks and citation omitted). To succeed on a breach-of-

---

System marketing kit; and (4) provide Setiba with the proper and required maintenance on the Viva System. (*See* Setiba's Resps. Interrogs. 12–13). Venus argues — and Counter-Plaintiffs dispute — Setiba breached the Agreements by shipping the Viva System to Venus in significantly damaged condition. (*See* Mot. 13). Because there are disputes of fact as to at least one of the alleged breaches, as discussed above, the Court does not address the parties' competing (and scant) arguments relating to the other breaches and performance defenses.

[7] Venus contends Counter-Plaintiffs' breach-of-contract counterclaims fail because Counter-Plaintiffs "have not offered, nor can they offer, any evidence whatsoever of damages." (Mot. 16). Yet, Venus identifies the specific damages Counter-Plaintiffs seek as a result of Venus's alleged breaches of the Agreements. (*See* Venus's SOF ¶¶ 72–75). In any event, simply stating Counter-Plaintiffs have not offered any evidence of damages, without any explanation whatsoever or discussion of Counter-Plaintiffs' submissions, is unpersuasive. (*See* Khajavi Decl. ¶ 35 (stating Venus "has caused Setiba damages in that [Setiba] paid monthly payments under the Agreements . . . and for lost business, profits, and revenue for patients [Setiba] lost due to the failure of Venus to comply with the Agreements, as well as the cost of replacement equipment." (alterations added)); Setiba's Resps. Interrogs. 19 (providing numbered list of damages)).

[8] Similarly, the Court will not grant summary judgment on Venus's breach-of-guaranty claims. (*See* Mot. 14–15). This is because "[t]he same elements required to prove a breach of contract claim must be established to successfully allege a breach of guaranty claim." *PNC Bank, N.A. v. Healey Plumbing, Inc.*, No. 19-Civ-60068, 2019 WL 3890858, at *2 (S.D. Fla. June 6, 2019) (alteration added; citation omitted).

express-warranty claim, Counter-Plaintiffs must show: "(1) a covered defect existed in the product at the time of sale; (2) notice of the defect was given within a reasonable time after the defect was discovered; and (3) [Venus] was unable to repair the defect." *McLaughlin v. Monaco RV LLC*, No. 8:14-cv-703, 2015 WL 5355465, at *3 (M.D. Fla. Sept. 14, 2015) (alteration added; internal quotation marks and citations omitted).

"Unless an ordinary juror can reasonably attribute a product's failure to a defect rather than to another cause (for example, ordinary wear and tear, abnormal usage, or improper maintenance), the plaintiff must proffer competent and admissible opinion testimony that a manufacturing defect more likely than not caused the failure." *Thomas v. Winnebago Indus., Inc.*, No. 8:16-cv-177, 2017 WL 2348789, at *1 (M.D. Fla. May 30, 2017) (citation omitted). Expert testimony, however, is not uniformly required to establish a defect if that defect is one understood by a reasonable juror. *See Bailey v. Monaco Coach Corp.*, 350 F. Supp. 2d 1036, 1045 (N.D. Ga. 2004) (citation omitted; applying Florida law); *see also McLaughlin*, 2015 WL 5355465, at *4. Instead, "the nature of the alleged defect will dictate whether a plaintiff needs expert testimony." *McLaughlin*, 2015 WL 5355465, at *4 (internal quotation marks and citation omitted).

Venus contends since Counter-Plaintiffs have not retained an expert witness, Counter-Plaintiffs' breach-of-express-warranty counterclaims fail.[9] (*See* Mot. 17–19). In Venus's view,

---

[9] Venus asserts Counter-Plaintiffs breached the Agreements' express-limited-warranty provision because Setiba admitted it did not use Venus's proprietary Glide Glycerin product, which, according to Venus, the Agreements required. (*See* Mot. 17–18; *see also* Velocity Agreement ¶ 9(f.); Viva Agreement ¶ 9(f.)). Setiba insists Venus "failed to make its proprietary gel available to Counter-Plaintiff[s] making compliance with th[ese] provision[s] impossible." (Resp. 6 (alterations added); *see also* Khajavi Decl. ¶ 27). The parties' competing versions of the facts militate against summary judgment on this ground.

Venus also argues — in a perfunctory manner — that Counter-Plaintiffs' breach-of-warranty claims fail because Counter-Plaintiffs provide no competent evidence of damages. (*See* Mot. 19). Aside from general rule statements, and the assertion Counter-Plaintiffs provide no competent evidence of damages, Venus provides no analysis to support its contention. (*See id.*). The Court will not grant Venus summary judgment on this basis.

Counter-Plaintiffs "cannot prove their warranty claims without expert testimony because, given the complex, technical nature of the Velocity System for laser hair removal and the Viva System for skin resurfacing, the elements of defect are not amenable to proof by lay testimony[.]" (*Id.* 18 (alteration added)). As to the Viva System, Venus states "Setiba never reported any problem . . . and did not request any maintenance, so there is no issue regarding a breach of the Viva System's warranty." (Reply 5 (alteration added)). The Court agrees in part, addressing the Velocity System and Viva System in turn.

First, the Velocity System. Counter-Plaintiffs contend "there is more than sufficient evidence of a defect to make the existence of a defect a triable issue [] without an expert [witness]." (Resp. 3 (alterations added)). In support, Setiba points to the following facts: (1) Venus "fail[ed] to provide [Counter-Plaintiffs] with working equipment and fail[ed] to adequately provide the warranty repairs or replacements when requested[]" (*id.* (alterations added); *see also* Khajavi Dep. 167:17–169:16 (testifying that for three months, Setiba did not have a functioning Velocity System despite several calls and e-mails to Venus to repair or service the Velocity System); Setiba's Resps. Interrogs. 12 (stating Venus's manager immediately realized "something was wrong" with the Velocity System at the time of delivery (internal quotation marks omitted))); (2) the Velocity System produced several "error messages" (Resp. 3 (internal quotation marks omitted); *see also* Khajavi Decl. ¶ 11); (3) the Velocity System burned patients during treatments with Setiba (*see* Resp. 3; *see also* Khajavi Dep. 176:12–177:1 (explaining Setiba "stopped using the [Velocity System]" as patients "were burned or [] injured" while receiving treatments with Setiba (alterations added))); and (4) Venus's service technician attempted to repair the Velocity System loaner but was unable to adequately repair the system (*see* Resp. 3–4; *see also* Counter-Pls.' SOF ¶ 86;

Setiba's Resps. Interrogs. 12–13).  In Setiba's view, "[a]ll of these facts create a reasonable . . . inference [] there was a defect" in the Velocity System.  (Resp. 3–4 (alterations added)).

In response, Venus contends Counter-Plaintiffs "cannot meet[] their burden to prove [] [the Velocity] System was defective at all, much less at the time of sale, as required for their warranty-based . . . counterclaim[]."  (Reply 5 (alterations added)).  According to Venus, Counter-Plaintiffs' evidence is "unsupported" and "plainly insufficient" to show a covered defect in the Velocity System.  (*Id.* 6).  Venus insists Counter-Plaintiffs are required to prove their breach-of-warranty claim through expert testimony.  (*See id.* 5–6).

The Court declines Venus's invitation to decide whether Counter-Plaintiffs can meet their burden of proving the Velocity System was defective at trial, especially given the inadequate briefing addressing the issue.  Venus offers no evidence of the absence of a defect in the Velocity System,[10] does not refute Counter-Plaintiffs' evidence, and does not discuss the complexity of the medical system at issue, save for the singular reference the Velocity System is complex.  (*See* Mot. 17–19; Reply 5–6).  Instead, Venus provides the Court with general rule statements, vague attorney assertions,[11] and out-of-state authorities[12] applying foreign law — not any controlling (or

---

[10] Venus cites a single page of its Maintenance and Technical Support Records [ECF No. 56-4] to support its position that Counter-Plaintiffs' facts are "unsupported" and "plainly insufficient" to establish a defect in the Velocity System.  (Reply 4 (citing Maintenance and Technical Support Records 2)).  Venus contends the Velocity System's "'error messages' could mean Setiba was not using [the Velocity] System correctly, which occurred at least once[.]"  (*Id.* 6 (alterations added)).  Contrary to Venus's insistence, simply citing a single page of its Maintenance and Technical Support Records, while referencing *one* of Counter-Plaintiffs' facts, does not lead to the conclusion *all* of Counter-Plaintiffs' facts are "unsupported" and "plainly insufficient" to establish a defect in the Velocity System.  (*Id.*).  Tellingly, Venus cites no authority for this proposition.  (*See id.*).

[11] By way of example, Venus contends — without citing any factual or evidentiary support — Counter-Plaintiffs "cannot prove their warranty claim[] without expert testimony because[]" of "the complex, technical nature of the Velocity System for laser hair removal[.]"  (Mot. 18 (alterations added)).

[12] *Haynes v. Cyberonics, Inc.*, No. 1:09-cv-2700, 2011 WL 3903238 (N.D. Ga. Sept. 6, 2011), on which Venus relies, is off point.  In *Haynes*, the court held the plaintiff's strict-liability-manufacturing-defect claim failed because the plaintiff relied entirely on the "fact that he suffered a serious shock with th[e]

persuasive) authority applying Florida law.  (*See* Mot. 18–19; Reply 5–6).  Given the inadequate briefing from both sides on this narrow issue, the Court will not, as Venus invites the Court to do, announce a bright-line rule Counter-Plaintiffs are required (or not required) to proffer expert testimony in order to establish a defect in the Velocity System.[13]  Accordingly, Counter-Plaintiffs' breach-of-express-warranty claim as to the Velocity System may proceed.[14]

Second, the Viva System.  Counter-Plaintiffs claim "Venus provided Setiba with a 2017 Venus Viva demo machine" and not "with a new 2018 model," which "was purchased by Setiba" and "the subject of the [Viva] Agreement."  (Khajavi Decl. ¶ 24 (alteration added); *see also* Khajavi Dep. 34:14–15 (stating Setiba "never received [the] 2018 Viva [System] based on the contract" (alterations added))).  Stated differently, Counter-Plaintiffs admit Venus did not deliver the *warranted* Viva System according to the Viva Agreement.

---

device" to establish a manufacturing defect and did not proffer *any* other evidence.  *Id.* at *6 (alteration added).  The device was a Vagal Nerve Simulator — an "electrical generator that sends periodic electronic stimulation via a thin, flexible wire to the left vagus nerve."  *Id.* at *1.  The facts in *Haynes* are not analogous to the facts presented here.

  First, the *Haynes* defendant, unlike Venus, explained in detail the complex nature of the medical device at issue.  *See id.* at *1, 6.  Second, the *Haynes* plaintiff, unlike Counter-Plaintiffs, did not respond to the defendant's statement of undisputed facts.  *See id.* at *3.  Third, Counter-Plaintiffs submit evidence of the Velocity System's defective condition and do not solely rely on one vague assertion the product is defective.  *See id.* at *6.  And finally, the *Haynes* court applied Georgia — not Florida — law to a strict-liability-manufacturing-defect claim.  *See id.* at *5–6.  Venus provides no meaningful discussion as to why the *Haynes* court's analysis of a strict-liability-manufacturing-defect claim under Georgia law is relevant to a breach-of-express-warranty claim under Florida law.  Instead, Venus simply offers out-of-context quotations with the conclusion "[t]he same is true here."  (Mot. 19 (alteration added)).  Venus's invocation of *Haynes* fails to persuade.

[13] To be clear, the Court is not re-allocating the burden of proof on Counter-Plaintiffs' breach-of-warranty claim but instead declining to address the merits of the claim given the superficial briefing.

[14] Although the Court denies Venus's Motion on this claim, Counter-Plaintiffs "should be well aware [] the mere fact [] the Court has denied summary judgment does not mean [Venus] will not prevail following a motion for judgment as a matter of law submitted pursuant to Rule 50 of the Federal Rules of Civil Procedure."  *Ogden v. Hillsborough Cty., Fla.*, No. 8:08-cv-1187, 2009 WL 10670805, at *3 (M.D. Fla. June 24, 2009) (alterations added); *see also, e.g.*, *Abel v. Dubberly*, 210 F.3d 1334, 1337 (11th Cir. 2000) (explaining Eleventh Circuit precedent "expressly permits consideration of a Rule 50 motion after the denial of summary judgment"; (collecting cases)).

Counter-Plaintiffs' position defeats their breach-of-express-warranty claim.[15]   If Venus never delivered the *warranted* Viva System, as Counter-Plaintiffs insist it did not, Counter-Plaintiffs cannot satisfy the elements of their breach-of-express-warranty claim.   Indeed, "a breach of warranty does not occur when the seller completely fails to deliver or where a buyer rejects goods." *Apex Mach. Co. v. Ritter GmbH*, No. 06-60689-Civ, 2007 WL 601719, at *2 (S.D. Fla. Feb. 16, 2007) (citations omitted); *see also Kelly v. Lee Cty. R.V. Sales Co.*, No. 8:18-cv-424, 2019 WL 5887482, at *8 (M.D. Fla. Nov. 12, 2019) (explaining "a breach of warranty occurs only if the goods are defective upon delivery" (alterations adopted; internal quotation marks omitted; quoting *Royal Typewriter Co., a Div. of Litton Bus. Sys. v. Xerographic Supplies Corp.*, 719 F.2d 1092, 1103 (11th Cir. 1983))).   In sum, Counter-Plaintiffs' breach-of-express-warranty claim as to the Viva System fails.

### C.   Implied Warranties of Merchantability and Fitness (Counterclaim Counts VI–IX)

Counter-Plaintiffs allege Venus breached the implied warranties of merchantability and fitness for the Velocity System and the Viva System.   (*See* Countercl. ¶¶ 53–76).   Florida law authorizes "[s]ellers [to] exclude or limit . . . implied warranties in the sale of goods." *Barnext Offshore Ltd. v. Ferretti Grp. USA, Inc.*, No. 10-23869-Civ, 2011 WL 13223746, at *8 (S.D. Fla. May 16, 2011) (alterations added; citations omitted).   To properly disclaim an implied warranty of

---

[15] Counter-Plaintiffs' position corroborates Venus's claim "Setiba never reported any problems with the Viva System and did not request any maintenance." (Venus's SOF ¶ 47).   Although Counter-Plaintiffs contend this fact is "[d]isputed" (Counter-Pls.' SOF ¶ 47 (alteration added)), such dispute focuses on Venus's failure to deliver the Viva System and to provide adequate training — issues relating to Counter-Plaintiffs' breach-of-contract claim, not their breach-of-warranty claim (*compare* Countercl. ¶¶ 35–38, *with id.* ¶¶ 48–52).   (*See, e.g.*, Counter-Pls.' SOF, Ex. C [ECF No. 75-3] 4 (requesting that Venus retrieve the demo machine from Setiba's office); *id.* 5 (same); *id.* 11 (e-mailing concerns to Venus about the Viva System, none of which address defects in the Viva System's material and workmanship); Counter-Pls.' SOF, Ex. A [ECF No. 75-1] 15 (expressing concerns regarding training and tips for the Viva System); Khajavi Dep. 73:2–75:7 (discussing inadequate Viva System training); Khajavi Dep. 80:1–86:19 (discussing Setiba's complaints relating to the inability to schedule training with Venus)).

merchantability, "the language must mention merchantability and in case of a writing must be conspicuous[.]"  Fla. Stat. § 672.316(2) (alteration added).  To exclude an implied warranty of fitness, "the exclusion must be by a writing and conspicuous[;]" it is sufficient if it states "[t]here are no warranties which extend beyond the description on the face hereof."  *Id.* (alterations added; internal quotations marks omitted).

A warranty term or clause is "conspicuous" where it is "so written, displayed, or presented that a reasonable person against which it is to operate ought to have noticed it."  Fla. Stat. § 671.201(10).  Conspicuous terms include: (1) "[a] heading in capitals equal to or greater in size than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same or lesser size"; and (2) "[l]anguage in the body of a record or display in larger type than the surrounding text or set off from surrounding text of the same size by symbols or other marks that call attention to the language."  *Id.* (alterations added).  "Whether a term is 'conspicuous' is a decision for the court."  *Id.*

Venus directs the Court's attention to the following paragraph found within the "<u>Warranty Cancellation; Limitation</u>[]" provision:

> The warranties provided in this Section [] constitute Venus['s] [] sole and exclusive liability for defective or nonconforming Systems . . . . These warranties are in lieu of all other warranties express or implied or statutory, including, but not limited to, implied warranties of merchantability or fitness for a particular purpose . . . . EXCEPT AS EXPRESSLY SET FORTH HEREIN, VENUS [] SHALL NOT BE LIABLE AND IS FURNISHING NO OTHER WARRANTIES AND THE CUSTOMER ASSUMES ALL RISK IN CONNECTION WITH THE USE OF THE EQUIPMENT AND SYSTEMS OTHER THAN AS EXPRESSLY STATED HEREIN.

(Velocity Agreement ¶ 9(f.) (alterations added; underlining and capitalization in original); *see also* Viva Agreement ¶ 9(f.)).  Venus contends Counter-Plaintiffs' implied warranty claims "fail as a matter of law" because the "disclaimers . . . in the Agreements are plain and conspicuous, set forth in a separate paragraph with capital lettering[.]"  (Mot. 20 (alterations added)).  The Court agrees.

The Agreements signed by Setiba and Khajavi expressly and conspicuously disclaim the implied warranties of merchantability and fitness as required under section 672.316(2), Florida Statutes. Specifically, the warranty disclaimers: (1) reference "merchantability"; (2) are set off in their own paragraphs; (3) include the only capital letters on the pages; (4) appear on pages Khajavi, as the representative of Setiba, initialed; and (5) are set forth in paragraphs titled, "Warranty Cancellation; Limitation[.]" (Velocity Agreement ¶ 9(f.) (alteration added; underlining in original); *see* Viva Agreement ¶ 9(f.)); *see also Wyse v. Gerard Roof Prod., LLC*, No. 3:19-cv-121, 2019 WL 7347179, at *4 (N.D. Fla. Nov. 12, 2019) (finding disclaimer satisfied the requirements of section 672.316 because the disclaimer was "set off as its own paragraph," was "in all capital letters," and was set forth in a paragraph titled "NO OTHER WARRANTIES." (internal quotation marks omitted; capitalization in original)); *Progressive N. Ins. Co. v. Therm Tech. Corp.*, No. 8:06-cv-1252, 2007 WL 4557206, at *6 (M.D. Fla. Dec. 21, 2007) (finding the warranty disclaimer conspicuous where it was printed in all capital letters).

The Court finds the "Warranty Cancellation; Limitation" provisions in the Agreements satisfy the requirements of section 672.316(2), Florida Statutes, and thus, Venus effectively disclaimed the implied warranties of merchantability and fitness for both the Velocity System and Viva System.[16] Thus, Counter-Plaintiffs' breach-of-implied-warranty counterclaims in Counts VI to IX fail.

---

[16] Counter-Plaintiffs contend the disclaimers are not sufficiently conspicuous to meet the requirements of section 672.316(2), Florida Statutes because the disclaimers are: (1) "five pages into a seven-page legal agreement[]"; (2) "the same small font size as the rest of the [A]greement[s]"; and (3) "not in bold." (Resp. 7 (alterations added)). But as Venus correctly notes, Counter-Plaintiffs "completely ignore" that the disclaimers include "capital[] letters" and are "the only writing in capital[] [letters] on the page[s]." (Reply 7 (alterations added)); *see also, e.g., Barnext Offshore Ltd.*, 2011 WL 13223746, at *8 ("Using all capital letters is conspicuous." (citations omitted)); *Bluewater Trading LLC v. Fountaine Pajot, S.A.*, No. 07-61284-Civ, 2008 WL 895705, at *3 (S.D. Fla. Apr. 2, 2008) ("[P]rinting a disclaimer in all capital letters is a commonly used method of making it conspicuous[.]" (alterations added; footnote call number omitted)).

### D.  Violation of the FDUTPA – (Counterclaim Count XIII)

Count XIII of Counter-Plaintiffs' Counterclaim raises a claim against Venus under the FDUTPA.  (*See* Countercl. ¶¶ 98–101).  The FDUTPA "protect[s] the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2) (alteration added).  The "FDUTPA can be violated in two ways: (1) a per se violation premised on the violation of another law proscribing unfair or deceptive practice and (2) adopting an unfair or deceptive practice."  *Felice v. Invicta Watch Co. of Am., Inc.*, No. 16-cv-62772, 2017 WL 3336715, at *2 (S.D. Fla. Aug. 4, 2017) (internal quotation marks and citations omitted).

"An unfair practice is one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."  *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003) (internal quotation marks and citations omitted).  An act is deceptive "if there is a representation, omission[,] or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *Millennium Commc'ns & Fulfillment, Inc. v. Office of the Att'y Gen.*, 761 So. 2d 1256, 1263 (Fla. 3d DCA 2000) (alteration added; internal quotation marks and citation omitted).

Venus contends Counter-Plaintiffs' FDUTPA allegations are "entirely duplicative" of Counter-Plaintiffs' breach-of-contract, breach-of-warranty, and misrepresentation claims.  (Mot.

---

If Counter-Plaintiffs intended to argue the disclaimers are not conspicuous because the terms "merchantability" and "fitness for particular purpose" do not appear in all capital letters — which is unclear — the Court remains unpersuaded.  *See Dobson Bros. Constr. Co. v. Arr-Maz Prods., L.P.*, No. 8:13-cv-1553, 2013 WL 12202522, at *4 (M.D. Fla. Dec. 9, 2013)*, report and recommendation adopted*, 2014 WL 12697204 (M.D. Fla. Jan. 8, 2014) (finding warranty disclaimer conspicuous even though the clause referencing "merchantability" and "fitness for particular purpose" was not in all capital letters and appeared "in small but readily legible type" (internal quotation marks omitted)).

CASE NO. 19-22642-CIV-ALTONAGA/Goodman

22).  According to Venus, Counter-Plaintiffs' "FDUTPA claim fails for the same reasons those

claims do."  (*Id.*).  But the Court has already concluded Counter-Plaintiffs' breach-of-contract

claims, as well as one breach-of-warranty claim, survive Venus's Motion, *see* Part III, A., B.,

*supra*; and, while the Court did not address Counter-Plaintiffs' misrepresentation claims, the Court

will not comb through Venus's briefing in search of an argument that applies to Counter-Plaintiffs'

FDUTPA claim.  Accordingly, Counter-Plaintiffs' FDUTPA claim may proceed.

### IV.    CONCLUSION

For the foregoing reasons, it is **ORDERED AND ADJUDGED t**hat Plaintiff/Counter-

Defendant, Venus Concept USA, Inc.'s Motion for Summary Judgment **[ECF No. 55]** is

**GRANTED in part** and **DENIED in part**.  Plaintiff/Counter-Defendant, Venus Concept USA,

Inc.'s Motion is **DENIED** with respect to **Counts I** to **IV** of the Complaint and with respect to

**Counts I**, **II**, **IV**, and **XIII** of the Counterclaim.  Summary judgment is granted in favor of

Defendant, Venus Concept USA, Inc., as to **Counts III** and **V** to **XII** of the Counterclaim.  The

parties shall submit a joint a pre-trial stipulation, proposed jury instructions and verdict form, and

motions in *limine* by **June 15, 2020**.

**DONE AND ORDERED** in Miami, Florida, this 3rd day of June, 2020.

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:      counsel of record